Would you open your argument, please? Mr. Mitchell, you're muted. My apologies. May it please the court, my name is David Mitchell. I represent the appellants Chris Crutcher and Tri-Lakes Diagnostic Imaging LLC. This action arises out of a dispute between my client who operated a diagnostic imaging facility in Branson, Missouri, and a PPO entity, a Preferred Provider Organization, Multiplan, and PHCS. The nature of such an agreement in a PPO relationship is such that a PPO stands as sort of a middleman, if you will, between healthcare providers and claim payors, which are typically insurance companies or self-funded plans. They connect these individuals for mutual benefit. The benefit to entities such as my client is that they receive increased volume of patients by having the insurance companies insured steered to them for services. In exchange, they accept a reduced contract rate, so a reduced payment, and it's a mutually beneficial relationship. This is all governed by contract, and that's sort of the crux of where the dispute arises here. We have alleged in material part for this appeal that the contract that applied between the parties was breached specifically with respect to the arguments we've raised here. The terms that dictated the percentage of the discount that my client was willing to accept, what we've alleged and what we've argued in the district court was that Multiplan violated the 25% discount, which was expressly articulated there, by modifying the agreement unilaterally, which was in violation of another express term of that contract that stated that the contract may only be modified by mutual agreement of the parties. Now, counsel, would you specify the origination of the contract you're referring to and who the two contracting parties were? Yes, Your Honor. That's a very good point. The original contracting party, this is the contract that goes back to April of 2000. The original contracting parties was a provider by the name of Medical Investments of Branson, a.k.a. Branson Imaging. It's a similar practice to my clients, and the PPO entity at that time was an entity called Up and Up, United Payers and United Providers. That entity, that PPO provider, was subsequently acquired by a series of acquisitions, corporate acquisitions, that ultimately became property of Multiplan, the appellees in this case, the defendants. My client took over that contract as far as what we've alleged and what we presented to the court. By virtue of similar corporate acquisitions, there were name changes and changes to the practice, but it operated out of the same office location as the original contracting party in that contract. So what I'm asking is, what's the time relation between the time of your client's takeover of the imaging company or becoming the proprietor of the imaging company and the alleged modification of the contract? Right. Okay, so my client started her practice in February of 2000. She opened this as a Missouri LLC under the Missouri Limited Liability Act. It was a brand new practice. It was a new legal entity. The issue that we have with the district court is that the court found that the contract had been modified prior to my client opening this practice, creating this business, by virtue of a letter that was sent by multi-plan to the prior entity, the contracting entity, the original contracting entity, back in August of 2007. The issue is, as we've argued in our brief, that the court seemed to have weighed the evidence because there was certainly testimonial evidence on the part of my client and on the part of her husband who worked at a prior entity that was in that office space at the time that letter was sent. By which they both of them stated they had never seen that letter before. They were unaware of any such effort to modify the contract to impose a different type of a fee schedule arrangement. Number one. And number two, we have evidence by way of specifically, once my client did contact multi-plan, this happened in June of 2008 after practice opened, she stated she had taken over this business and she wanted to become a contracting member of this network. She then began asking for copies of the contract that applied and when she saw the discount for being applied to her explanation of benefits forms that accompanied checks that were received from the insurance companies, multi-plan in July of 2009 sent her a copy. First, they said they didn't have a copy of a contract. She probably needed a new one and then a week later they sent her a copy of the original contract that we're referring to here. Say here's the contract that's in effect. That contract had the original contract term of 25% discount. There was no mention of a modification at any time until this litigation arose. So my client had continued to operate under the assumption that this was a 25% discount and of course there was argument by the defendant or the appellee that well, she was paid according to that discount rate and therefore by accepting those payments, she must have understood that this was a contract had been modified. Again, that goes to the the weight of the evidence because my client testified, so there is testimonial evidence, that she did not, she was not paying attention to billing. She was mostly working as a diagnostic imaging, running her practice in that way, and every now and then she would see something that generated some curiosities. Now understanding she was not only contracted with multi-plan. There were other PPO's and a lot of stuff coming in and going. And she stated that she, and there is evidence of this as well in the record, that she contacted multi-plan on numerous occasions to get explanation of what was going on and she was told by their representative. Was there any, what was the evidence with respect to the letter being sent to Branson Imaging and whether Branson Imaging, not necessarily your clients, whether Branson Imaging received the revised fee schedules? Yes, your honor. Of the only evidence that was ever introduced in the trial court with respect to the letter having been sent was simply a, the letter being attached to an affidavit by an employee of multi-plan stating that on such-and-such date multi-plan sent a letter to Branson Imaging attached. There was no evidence on the Branson Imaging side other than your clients involvement. Right, and her husband who was the only employee other than my client of that prior entity, they didn't work for Branson Imaging or the, you know, the entity that was, it was called Tri-Lakes Diagnostic Technologies actually. Positive, even in the absence of clear evidence of the receipt of the revised fee schedules, what about the fact that Branson Imaging for a period, I think of years, received the larger discount and didn't protest. Isn't that effectively a waiver and your client basically just took what Branson Imaging had? Actually, what the evidence reflects is that letter was sent on August 1st of 2007. It stated in the letter that the, wouldn't take effect until December of 2007. My client's business was opened and effectively took over in February of 2008. So it's not a period of years. It's in fact a period of perhaps a month or two and there's no evidence that that discount rate was ever applied to any claims by Branson Imaging because Branson Imaging, at the time that my clients were transitioning, were not processing any claims under Branson Imaging. So there's no evidence that that was ever applied, that discount rate was ever applied prior to my client starting her practice in February of 2008. Counsel, oh go ahead. I think you had a follow-up. Go ahead. Okay. What about the fact that, you know, when you're talking, I know insurance reimbursements are complicated. We all get our EOBs from our insurance company. But the fact of the matter is a 25% discount rate is pretty straightforward. You take the total amount and the allowed amount is, you know, 25% lower and apparently for years your client was receiving reimbursements not at 25%. Shouldn't that have put your client on sort of constructive notice at least that the reimbursement rate had changed? I would agree and I would say that the evidence reflects that she did make more than sufficient inquiry of Multiplan to determine what in the heck was going on. She contacted them by phone on numerous occasions and there's evidence in the record by way of Multiplan's own business notes that states that when she asked what is going on, what's the fee schedule, what's my reimbursement rate? They said it's a complex rate. Look at your contract. That was all they were able to tell her. So she said send me my contract. There's evidence that she requested a copy of the contract and the evidence shows that the only contract that was ever sent by Multiplan was the original contract showing 25%. So it's understandable why she had her vexation of not being able to get a read on what was going on here and feeling like she had been, you know, wrongfully treated by this company this entire time which led to this litigation. Let me just follow up. So it sounds to me, you know, a lot of these health providers have a separate billing person or whatever that handles insurance reimbursements and such because it's very complicated. This one happened to be a little less complicated before. But it sounds to me, and I don't mean to demean your client in any way, but it sounds to me like the theory of the case, at least this point from your side, is that my client really wasn't a business person. She's a diagnostic imaging person and she didn't pay that close of attention and to the extent she did pay close attention, she got wrong information from the insurance company. Is that the basic theory that we have here in terms of why there is a waiver? That's generally accurate. That's that reflects the testimony and the evidence in the record at this point or at this point throughout the litigation. She certainly was not a business person in the sense that she had ever operated and owned such a business. She admittedly stated that in her deposition that it was sort of a new thing for her. And she was sort of feeling the ropes out as she was, you know, working in this process towards the beginning and throughout the process. She did have a billing person as well. And again, you know, that person had communicated as well with Multi-Planet and the information just it was inaccurate. It was But it wasn't any due to her lack of effort to try to get to the bottom of it. So that's one of the issues in the case. And then the other issue that we've raised on appeal is the attorney's fee provision. The court's interpretation of the indemnity clause in that in this case as not providing for recovery of attorney's fees for my client's Pursuit of and enforcement of the breach of contract which the court did find in her favor at least with respect to part of the Modification the second modification and the violation of the anti-leasing provision By Multi-Plan by leasing the discount rate out to the Mitchell. Mr. Mitchell. How can the indemnity clause? Apply here when your client was prosecuting the case rather than defense Comprehends including attorney's fees, right? Doesn't that term kind of specifically suggest that it has to be in defense of a case not in prosecution of the case. I That's not my reading of it What the the indemnity provision here specifically states that up and up or in this case Multi-Plan by by acquisition shall indemnify and hold provider harmless from loss or damage which damage is then defined as Including reasonable attorney's fees and defense fees so there's a distinction between those two things that would seem superfluous if if attorney's fees only meant defense fees number one and then a rising out of wrongful acts and omissions of up and up in Performing its services under this agreement, which would cover all of the contractual obligations here and as we know a rising out of has is interpreted under Missouri laws as other states as a broad Term that that denotes a nexus or a connection with so as Judge Harpole interpreted this provision to mean damages including attorney's fees flowing from Multi-Plan's wrongful acts and applying discounts to TLDI services. The problem is he determined or his ruling stated that There was no Intention to provide or cover attorney's fees for inter-party litigation because of the absence of magic language saying litigation between the parties Reading the monarch fire case from the 8th Circuit far too narrowly It's why it's our position that that the 8th Circuit did not make any such ruling in that case that You I want to ask you about that Jacobson warehouse versus schnook markets decided two and a half weeks ago, and you may not be familiar with it But it relies on monarch and it says the really indemnity clauses are about third-party claims And that's why it explains that's why we require an express statement a very express statement So it kind of it's monarch on in steroids on steroids to some extent What would be a response that are you familiar with the case and as a way to distinguish that? I'm actually not Regret to say that I'm not at this point. I would look at the monarch case and I think that the the dissent that was art that was Articulated by Judge Grunder in that case was was very comprehensive and in fact, there's a Missouri Court of Appeals case from 2018 Davis versus Johnson controls that goes into a lengthy and very comprehensive analysis of what what a Provision that expressly refers to litigation means then it's not buzz language that says litigation between the parties it's broad language that would that would otherwise especially when you're talking about contracts of adhesion that are drafted by this other party that would allow any ambiguity to be in construed in favor of coverage or In this case attorneys fees applying to these two parties and it all goes back to the Nussbaum Supreme Court case Missouri Supreme Court case the reason that this whole entire expressly referring the litigation between the parties issue has it has you know, the progeny of this Confusion, I guess all comes from the fact that in Nussbaum there was qualifying language that case Specifically that provision stated that it was a subcontractor contractor relationship. So those are already from the very from the get-go Typically Looked at as sort of a third-party indemnification Against third-party suits, but specifically in this provision It says that there's indemnity for loss damages and attorneys fees Arising out of a resulting from performance of the subcontractors work under this some contract But only to the extent caused in whole or in part by the negligent acts or omissions of the subcontractor It was that qualifying language that the Supreme Court of Missouri and Nussbaum Interpreted to found to articulate that there clearly wasn't a intention to cover Inter-party litigation there was no express Reference to litigation between the parties had that not been there and what the Missouri Supreme Court said was it had if there was such an intention that there shouldn't be such qualifying language and it should be Counselor more broad terms, which we have in this case and and we have mr. Mitchell. Mr. Mitchell your times expired Okay. Thank you, Your Honor Mr. King Yes, may it please the court Errol King with the Phelps Dunbar law firm representing the Appellees multi-plan Inc and private health care systems Inc There are two issues on appeal that I'm going to address them in the manner in which they came up this morning in the Questioning of mr. Mitchell first the breach of contract issue I think to understand how judge Harpool got to the vision that he reached on the breach of contract We have to go to the back of the case as David said, it's mr. Mitchell just said Chris Crutcher the owner of Trilite imaging started her business in February of 2008 But she needed to fit she needed to think one thing she needed was revenue She needed revenues and a second thing. She needed to get those revenues were patient. So what did she do? She started to contact? Companies that had contract had contracts with the predecessor companies to her organization Branson imaging and Trilite diagnostic technology one of those companies were my clients multi-plan and private health care system Chris Crutcher reached out to my clients in April of 08 May and June of 2008. She called them. She faxed them She wrote them letters. She definitely wanted to have a contractual arrangement with my client She told them we have the same location. We have the same address. We have the same equipment We have the same phone numbers as the predecessor The only thing that's changed is our name and our tax ID number Please allow us to be the party to the contract that that's in place with the part the predecessor company at the same Location and my client as it does with a lot of providers out there They're contracted with millions of providers of this happen frequently They have ceded to her request and they added her to the contract about July 2008 So from July I want to you're focusing a lot on the contract And I don't know if it's to your peril to be honest with you because when she then asked for the contract that you are once you agree that the That she would continue on as a provider in the network you sent the contract and the contract contained a 25% discount rate and so I'm not sure that going through all this contractual analysis really helps Okay, let me address that because I came up in questions to Mr. Mitchell Chris Crutcher was informed that the SSIM fee schedule was in place subject to the contract She was informed and it's in the record at such at page 1392 1393 What form did that take? What form did that communication take? She questioned what a reimbursement under with an EOB with one with one client So my client wrote her a letter on February 9th 2009 and it's Strictly said this is claim has been priced according to the SSI or I am the schedule and the Payment is correct and they gave her the amount of the payment and whatnot So she had that information at the earliest in February 9th 2009 If not before then we believe as Judge Hartful found that she did understand the terms of the agreement when she asked to be asked When she asked to be added to the contract in mid-2008 the fact that that SSRIM because it might have been sent to her as One of the judges one of your honors who just asked the question when she got the EOB She certainly could do the calculation and know she was in being paid at a 25% discount that it was much more than that But let me ask you this the SSRIM I want to ask you about that because I don't know what that is exactly. It's referenced throughout I'm sure there's something in the record that tells us what it is But to me the maybe you're going to tell me that this is very common in the industry and every health care provider would know What it is, but I would not know that that doesn't mean 25% It just seems like you know a health care gobbledygook to make but if there's something in the record that would indicate that people would Understand what an SSRIM fee schedule is when you when you pass that along I'm not aware of anything in the record that would explain what SSRIM mean I think to imaging providers. I mean I can't take a guess, but I think the imaging providers would mean something that's why you have I am in there, but I'm not aware of any sort of common Parlaments in the industry that would explain that your honor and we're going back to the 07 and 08 as well So it may have just been the name given to the fee schedule by my clients that evidence is just not in the record So there's nothing I can correct you on So then you go back to the 25% and if SSRIM and I you you rely on this telling her that it's this complex SSRIM fee schedule Provided her notice, but if nobody knows what that is She could have well assumed that it was the 25% That was listed in the contract that your client sent am I wrong about that? Yeah, yes, your honor respectfully. I do think you're wrong about that and judge Point-in-time if she had any sort of confusion as they alleged she could have picked up the phone and called and said send me the fee Schedule, but there was never any evidence of that. She accepted it. She got the EOB They gave her the payments under that fee schedule So she knew about it and again as I said We do have evidence in the record of in February 9 2009 of her being it being explained to her in detail by a written Letter, so we do have that evidence in the record I Can as I start, you know, she Chris Crusher needed patience. She needed revenue. She got both of them She got that for six years and she was very happy with that Judge Hawkins ruling was very obvious But it's very obvious where the waiver is here six years and accepting the benefits of a contract of getting Patients of getting spirits of patients through your door and revenue that that's more than worthy to find that you that she waived any Objection to the fee schedule, but I will I do want to address that just for a second The fee schedule had already been that contract had already been modified in 2007 before she even began her business That's what she stepped into that's what she was gonna counsel. This is Judge Smith Is 2007 when the letter was sent to the predecessor company notifying them about the fee schedule? Yes, your honor, and there is evidence in the record that Branson imaging and trial a diagnostic technology those companies that existed at a time did not push back and did not say we don't want this Well, what's the what's the evidence in the record that the predecessor received? Notice of the change to the fee schedule We have an affidavit I'm sorry declaration from Nina Conway an employee of multi-plan who? Attested that multi-plan's records indicate that the letter was made up to Branson imaging at State Highway in Branson, Missouri And then multi-plan kept a pushback log pushback Any providers who pushed back on the fee schedule and contacted multi-plan and said we don't want it They kept a log of those providers and Branson imaging trial a diagnostic technology It's not on that list so they did not contact multi-plan and say that we don't want this this modification to the contract So the modification went forward as of December 1, 2007 The proof of receipt the proof of receipt is a sworn statement of it having been sent is that accurate That's accurate in the record your honor But I'm going to go somewhere else with that and I'm going to say that I I don't know that that's truly an issue because if if the contract was not Validly modified in December 1, 2007 that was the that was the Position of the current owner of the contract to take not try late imaging They were not even formed to February 2008 So how could they say we didn't receive the letter the letter was sent to the predecessor company? There's no evidence that they ever said we never received the letter There's no just no evidence of that, but that would be their position to raise the previous I thought I thought mr. Mitchell said that his clients were sort of the sole employees of Predecessor and they both said that it was not received there. Do I misunderstand that? I Think you do. I don't know. I don't recall what mr. Mitchell said, but Chris Crutcher and her husband Chris Crutcher They're both Chris Crutcher They ran that business and what and what they said in their definitions is we didn't receive the letter We don't have any evidence of the letter in our record That's what they said But they were not at they were not employed by the previous owners of the company So they can't they can't attest as to what they whether they received a letter or not But they did put that at their definitions about whether they received the letter. So that's I think that's kind of a confusion there I don't know. This is just sniffing it. This is just smith again, which what's your view of the significance of the issue of fact about whether the The potential issue of fact as to whether that letter notifying of the change to the fee schedule was received or not Is that a material fact? It is not a material fact in my view and and I'm not Because because again as I said whether the modification what letter was received in 2007 would have been the position of the current owner of the contract then to make that argument and judge Did not rely upon that in making his decision at all If you read his decision, he did not he did not even focus on whether that August 1st 2007 letter was received present to him The contract had been modified already before she even began her business and before she had soon Stepping into the contract it had been done and so that's what she accepted and like he said in his decision She knew the terms of that contract that she's a business person. She had other contracts with other Payers other TPO so she knew the terms of the contract she was agreeing to and she council I want to I want to follow up on the chief's question. I think you might have a timing problem on the argument you're making now too because There are only two months between the letter to whatever was two months one month Whatever it was between the timing of that letter and the change of a business form My understanding is that there was never an agreement in writing Between the previous entity and multi-plan or whatever multi-plan was at the time So the agreement agreement in writing was never satisfied with the previous entity and I don't know how there could possibly be waiver With with with just a month or two of accepting lower rates And so I guess my question is is how is it not relevant or not a disputed material fact at this point? Given the short timing the short span between the letter and the change in corporate form It might be relevant The appellate standing before you was Tri-Lake diagnostic technologies or brains and imaging I don't think it's relevant in regards to the claim of Tri-Lake imaging Simply because they were not even formed at that particular point in time So this waiver argument that might have existed in 07 and the early part of 08 would have been the position for the previous predecessor to the contract to take As good as I can answer that Let me ask you this. Was there any agreement in writing? I know that you sent the letter did did the predecessor ever come back and say yeah, we're fine with that This this new reimbursement rate is just fine Or is that either doesn't exist or not in the record? Your honor. I don't know if it exists. It's just not in the record. We don't have those records again. This is up 2007 We're fighting over this in 2021 and it's just not in the record What is in the record is that they never said no they never contacted my client and said we don't want this new fee schedule We do know that much On the attorney fee issue. I want to I want to address that. Mr. King, just one more question real quick on that You said a few minutes ago that in February of 09 It was the new schedule was explained in detail to to the crutchers. What's the evidence of that? It's in the record at page 1392 and 1393 there's a February 20th 2009 letter that exists that was sent to Chris Crutcher that was produced in discovery that she had and Explained in detail the SSRI fee schedule and the amount that's being paid according to that fee schedule So did it say what percentage the SSRI M is going to pay? Yes, your honor it's in there and if you look at the SSRI M fee schedule Which is in the record at 1388 to 1391 Actually, it's page 1391 is the fee schedule it matches up perfectly The February letter matches up perfectly to the fee schedule the amount that she's being reimbursed And so and she accepted that and moved on and moved on it became a non-issue after that and we never heard from Chris Crutcher Again to 2015 was the fee schedule included with that February 09 communication My recollection is that it probably would it was not I can't I can't stay here and say it was I don't think it Was it was reference explained to her, but the fee schedule, you know, it was attached to the August 1st 2007 letter On the attorney fee issue. I have a question here In the trial court, we did not know we were going to win the case until Judge Hall who Is ruling and we didn't ask for attorney fee because our position is the identification provision doesn't allow for Attorney fees for litigation between the parties. We never asked for that And just horrible denied their claim for attorney fee So we never had to push back and even argue the issue of who the prevailing party was But if you look at this case, my question is who was the prevailing party? They sued us for seven causes of action Rico fraud conspiracy and just enrichment and breach of contract We want all those Just hopper dismiss all those causes of action with prejudice on our motion of summary judgment except for breach of contract and on that claim We won the vast majority of it Just hopper found that from 2008 when Chris Crutcher took the contract the tooth to November of 2014 There was no breach by my client He only found a breach on the back end from November 14 to when the contract terminated in September 2015 and he awarded $29,000 in damages. So in my view under the American rule, there's a long-standing Policy against substantial fee shifting and that's what the plaintiffs are asking this court to do with this attorney fee argument They're asking for it'll be six years of litigation on November 6th of this year because he filed the suit November 6 2015 they're asking for you to ship Tony see they're turning these on to us when we won the vast majority of this case We would be the prevailing party if any court were to look at that I'm confident of that and on the other point is again our language in our contract is very benign If anything, it doesn't have any sort of language that relates to litigation between the parties to enforcement of contractual rights to breach of the agreement or to any disputes between the party that lead to litigation and these are the sort of things we see in the cases that have allowed Attorney fees in an identification provision We just don't see that sort of language in the in the in the provision before the court I think we have to start the analysis and in the analysis with our language that we have here and Arising from actual or alleged wrongful acts or omissions in performing services contemplated under this agreement just doesn't get me there I think that language is much much closer to the language in the Nussbaum decision and in the Monarch decision and in the Jacobson case we um that we cited to the court. Although I have to confess like Mr. Mitchell I haven't seen the most recent pronouncement of the Jacobson case Your your time's expired Okay, thank you. Thank you. All right. Thank you. Mr. Mitchell. You used all your time in the opening we were We asked you quite a few questions We'll give you a one minute to conclude your argument and respond to anything that you feel compelled to Counsel I want to The teachers said but I'll tell you the 2009 letter that he just referenced I want to know about that because if it did reference the SSRI MP schedule you you have a problem So I want to hear your interpretation of that I Apologies that 2009 letter is not in fact a letter. It doesn't provide a detailed explanation. It's a hospital claim No adjustment notice that only there's only one reference to the word SSR I am with no explanation of what that means and it only states that you'll see it's at 1392 it only states that the that they determine that their Pricing of that claim was accurate and no adjustment is required Now what's important about the timing here? Is that again? This is February 2009? The key piece of evidence that that your honor referenced a moment ago Was that in July of 2009 when my client had communicated with multi-plan to get to the bottom of this Talk to people on the phone. They told her you need to see your contract She says send it to me made a request for it in July 2000 July 29th, 2009 She was sent a copy of the original contract with the 25% Discount provision no mention no reference to an SSRI MP schedule In fact that has never been for it was never provided to her until the deposition That was the first time she had ever seen any even a sample of what an SSRI MP schedule was Secondly as far as the evidence that would have been in the possession of Branson imaging there was Discovery done by way of third-party discovery Multi-plan sent a subpoena to a man named David Hintz who was the principal of that Trilakes diagnostic imaging aka Branson imaging That's at 960 Mr. Hintz responded to that subpoena at No records related to Branson imaging because he was not part of Branson imaging So there is no evidence in the record that that letter was ever received and again my clients were operating that entity at the time in August and You know August September October November and they stopped billing claims at the time that that letter what that fee schedule went into effect So as you mentioned your your time's expired. Thank you. Thank you All right, thank you counsel for both parties for the argument you've provided to the court today In supplementation to the briefing that's been submitted. We'll take the case under advisement